## CATHERINE BORLAND v. ELLIS STOKES.

ERROR TO THE COURT OF COMMON PLEAS NO. 1 OF PHILA-DELPHIA COUNTY.

Argued March 27, 1888—Decided May 7, 1888.

An action of trover will not lie to recover the value of securities loaned by the plaintiff to the defendant, where there is no evidence of a wrongful appropriation or detention of them, and the relation of the parties was simply that of debtor and creditor.

Before GORDON, C. J., GREEN, CLARK and WILLIAMS, JJ.; PAXSON, TRUNKEY and STERRETT, JJ., absent.

No. 233 January Term 1888, Sup. Ct.; court below, No. 793 March Term 1886, C. P. No. 1.

On April 10, 1886, an action of trover was brought by Catherine Borland against Edward Stokes, to recover damages for the conversion of certain of plaintiff's stocks and bonds. The plea was not guilty.

At the trial on October 26, 1887, the plaintiff testified in her own behalf:

I am the plaintiff in this case. I am unmarried and seventy-two years of age; have known Ellis Stokes for thirty years; I done his washing before his marriage and afterwards; my first cousin died in 1878, and left me some money. Ellis said if he had a friend to help him, and if I would give him some of my stocks he could get on his feet; he had been appraiser of my cousin's estate and knew what we got. I gave him some Catawissa preferred stock but afterwards got that all back; it was returned in two certificates instead of one; it came back all right. I gave him some Titusville stock, 500 shares, and afterward four bonds of the Buffalo, Pittsburgh and Western, for $1,000 each. He was to use them, we were to get the interest; they were not to be sold, but to be returned; I don't remember exactly what was said when he got them; I think he got them at the Fidelity. He afterwards got 50 shares of Catawissa preferred; he was only to use $450, he kept the whole. Then he got 10 shares of Catawissa preferred. I told him to lift a loan of $411 and to pay it off; he drawed them and paid it off; I told him to sell, but he didn't. One day I was down at Mr. Allinson's office, I had a mortgage to pay off in Maryland, and Mr. Allinson told me his agent in Baltimore wanted the money; I went round to the Fidelity to get the money, $900, and Ellis came to me and said Mr. Allinson had sent him to see that I did not get cheated. I gave him the 10 shares of Fire Association, he got me $900, and gave it to me, and said I could have more. Afterwards I had a mortgage paid off on the house Ellis lives in and received some $20,000. I then wanted to pay off all my debts, and especially the loan on the Fire Association, also all other advances; I asked Ellis to let me pay off the loan on the Fire Association, and he said no; I wrote to de-

Arguments.

fendant, he did not answer; then I registered a letter to him. Q. Were any of the arrangements in writing? A. No, it was all verbal. I did send letters but never got answers; the first I got a reply to was the registered letter; in verbal talks I said I would like to know what was coming to me, and he would send me accounts; in November or December, of 1885, was the last request for a settlement; before that I had asked him, but I can't say when. You will find by his own statements there when I got a statement. This is the reply I got to the registered letter (letter shown witness); I was never able before I brought suit to get my stocks or bonds; it was November, 1885, I first asked him for a settlement; I had asked him before that. You have all his statements, they will tell you when I first asked him for a return of the stocks; I asked him for the Huntingdon bonds once, there were five for one thousand dollars; he said he bought the Gunnison on a margin, and had to sell the Huntingdon to take off the margin. . . . . .

Cross-examined: He said he wanted to get on his feet; he had failed in 1878; he went into bankruptcy; he said if he had a friend he could do so; if I could give him these stocks he could get on his feet, and it would show he had friends; that was the beginning of his getting these stocks. (This being read to witness, she says it is right.) All I let him have was after he had said this. . . . . .

After statements of account and certain letters to and from the defendant, were put in evidence, the court, BIDDLE, J., on motion directed a compulsory nonsuit to be entered.

The court, on argument, having refused a motion to take off the judgment of nonsuit, the plaintiff took this writ, assigning as error:

1. The order directing the judgment of nonsuit.

2. The refusal of the motion to take off said judgment.

*Mr. John G. Johnson* and *Mr. George Junkin* (with them *Mr. Edw. P. Allinson*), for the plaintiff in error:

The evidence presented two questions of fact for the jury: 1. For what purpose were the stocks and bonds delivered to the defendant? 2. Did he claim to retain them as collateral security for advances he had never made?

1. There was no question that the stocks and bonds to recover

which the action was brought belonged to the plaintiff, but the learned court denied that there was such conversion as would sustain trover. The motion for the nonsuit having admitted all the facts which the jury might have fairly inferred from the testimony: Maynes v. Atwater, 88 Pa. 496; Miller v. Bealer, 100 Pa. 583, and it being error for the court in banc to refuse to take off the nonsuit when there is the slightest evidence on which the jury might find for the plaintiff: Bevan v. Insurance Co., 9 W. & S. 188, however slight the evidence of conversion, the case should have been left to the jury: Baker v. Lewis, 33 Pa. 301; Berg v. Abbott, 83 Pa. 177.

2. There was evidence from which the jury not only might have inferred but must have found: 1. Property in the plaintiff at least in the sixty shares of Catawissa and the ten shares of Fire Association, and refusal to return on demand, unless defendant was paid moneys falsely alleged to be due him. 2. An agreement to return the Catawissa which was entrusted to defendant for a special purpose, and to borrow for plaintiff a specific sum. 3. A demand for a return of the Fire Association and offer to pay the $900 borrowed on it, and a refusal to deliver Fire Association or to accept the $900. 4. That the Fire Association stock was sold by defendant after July 18, 1886, without notice to plaintiff and without any authority from her. If the jury found any one of these propositions to be true, the conditions necessary to sustain trover would have been present: Cooper v. Chitty, 1 Sm. L. C. 490; Arthur v. Sylvester, 105 Pa. 233; Jacoby v. Laussatt, 6 S. & R. 300; Singer Mfg. Co. v. King, 14 R. I. 511; Briggs v. Haycock, 63 Cal. 343.

3. On the assumption that the defendant had a lien against the 60 shares of Catawissa and 10 shares of Fire Association, it was his duty, on the request of the plaintiff, so to do, to furnish her with a true and correct statement of expenses incurred by him as bailee, or pledged for money loaned, etc., and his refusal to render such true and correct account is evidence of conversion: Wagenblast v. McKean, 2 Gr. 393. Any wrongful act which negatives or is inconsistent with the plaintiff's right is per se a conversion: Allen v. McMonagle, 77 Mo. 461; Gordon v. Stockdale, 69 Ind. 245; Daggett v. Davis, 53 Mich. 35; Bank v. Dunbar, 19 Ill. 558; Etter v. Bailey, 8 Pa. 442; Neiler v. Kelley, 69 Pa. 403; Work v. Bennett, 70 Pa. 484.

*Mr. G. Harry Davis* (with him *Mr. F. Carroll Brewster* and *Mr. F. Carroll Brewster, Jr.*), for the defendant in error:

1. The plaintiff parted with the individual control of her property as absolutely as did the plaintiff in Teetor v. Robinson, 7 S. & R. 181. In that case Teetor, an insolvent, had assigned to certain assignees all his property, among which was "a claim to a horse in the hands of Robinson." Having given security to deliver all the assigned property to the assignees in three months, Teetor brought trover against Robinson for the horse. The verdict was for the defendant. This court, sustaining the judgment, said: "After the assignment the property was out of the plaintiff, and, therefore, the present action cannot be supported."

2. The cases cited are inapplicable. The difficulty on part of plaintiff is to explain her own testimony. She put securities in defendant's hands to use; she approved of his action in selling stocks and buying others; drew dividends and allowed defendant to use the stocks for his own purposes. There was no restriction upon the use he was to make of them, and consequently no conversion without her consent. If she believes that upon an account stated there is a balance due her, she must select another form of action.

OPINION, MR. JUSTICE WILLIAMS:

The form of action in this case is trover. The plaintiff claimed to recover the value of eight railroad bonds given for $1,000 each, sixty shares of the preferred stock of the Catawissa Railroad Co., and ten shares in the Fire Association of Philadelphia, having an aggregate value as is alleged of $18,000. To entitle the plaintiff to recover, it was necessary that she should show a wrongful taking of these securities, a wrongful appropriation of them, or a wrongful detention of them from the owner.

The plaintiff was a witness in support of her claim, and gave an account of the manner in which her securities came into the hands of the defendant, and the business relations existing between them. He had failed in business, and been adjudged a bankrupt. He was anxious to get into business again, and applied to Mrs. Borland as a friend. He told her he needed a friend to help him, and that if she would let him have some of

her stocks he could get upon his feet again. She was disposed to help him and tells what she did in response to his appeal: " I gave him some Catawissa preferred stock, but afterwards got it back. . . . . . I gave him some Titusville stock, five hundred shares, and afterwards four bonds of the Buffalo, Pittsburgh & Western for $1,000 each. He was to use them, we were to get the interest; they were not to be sold, but to be returned. . . . . . He afterwards got fifty shares of Catawissa preferred; he was only to use $450; he kept the whole. Then he got ten shares of Catawissa preferred. I told him to lift a loan of $411. . . . . . He paid it off. . . . . . I gave him ten shares of Fire Association; he got me $900 and gave it to me, and said I could have more." Several statements of account rendered by Stokes to Mrs. Borland were also given in evidence by the plaintiff, which showed the receipt of stocks and bonds by the defendant, his sales or other disposition of them, and the appropriation made of the proceeds. The accounts extended over several years, and covered quite a large amount.

Mrs. Borland claims that there is a balance shown to be due her of some $2,000, while the defendant insists that some $3,000 are due to him. It is not important at this time to determine which of them is right. It is enough for the purposes of this case if the relation between the parties is that of debtor and creditor. It seems very clear from the whole of the evidence on the part of the plaintiff that the defendant was put in possession of the securities that appear in the statements of account, by the plaintiff, for the express purpose of assisting him to start in business, or to be converted into money for her own use. The use of them by the defendant in some proper business way was the very purpose for which they were placed in his hands. He could not be helped to get upon his feet by the mere custody of these securities. They were put in his hands to be used. Mrs. Borland says, " he was to use them ; we were to get the interest." It is no doubt true that he promised to replace the securities, so that Mrs. Borland's investments should continue substantially as they were ; but, like any other promise to pay for or to replace borrowed articles, it created only a debt to be enforced by an action on the contract. There was no evidence which the court could submit

to the jury upon the subject of a wrongful taking, for the securities were delivered by the plaintiff or on her order. It is equally clear that there was no wrongful appropriation or detention, for they were placed in his hands to help him start again in business. The relation of the parties was simply that of debtor and creditor. Mrs. Borland's security for her bonds and stocks was in the business capacity and integrity of the borrower. She must content herself with the security on which her loans were made, and if it fails to meet her expectations an action of trover must, under the evidence, prove equally disappointing.

The judgment is affirmed.