In re Hal **SHAFFER**, individually and d/b/a Shaffer Fleet Sales, Debtor.

Internet Automotive Group, d/b/a Daewoo of Los Angeles, a/k/a Autosquare USA, Plaintiff,

v.

Hal Shaffer, Defendant.

Bankruptcy No. C/A 03–02929–W.
Adversary No. 03–80337–W.

United States Bankruptcy Court,
D. South Carolina.

Jan. 23, 2004.

771

Walter L. Heinsohn, Rock Hill, SC, for Debtor.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

This matter comes before the Court pursuant to the Adversary Complaint ("Complaint") of Internet Automotive Group ("Internet Automotive") against Hal Shaffer ("Debtor") which alleges that Debtor owes a debt to Internet Automotive arising from conversion of Internet Automotive's sales proceeds and motor vehicles. At trial, Internet Automotive abandoned its action seeking a denial of Debtor's discharge pursuant to 11 U.S.C. § 523(a)(2) and stipulated that it would only seek denial of Debtor's discharge pursuant to 11 U.S.C. § 523(a)(6).[1] After considering the pleadings in this matter, the arguments of counsel, and testimony of witnesses at trial, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, which is made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7052.[2]

### FINDINGS OF FACT

1. Internet Automotive is in the business of selling automobiles at wholesale.

2. Debtor was a wholesale broker and dealer of pre-owned automobiles. Internet Automotive would deliver its pre-owned automobiles to Debtor who operated under the trade name Shaffer Fleet Sales. Debtor would prepare the pre-owned automobiles for resale and thereafter sell the automobiles himself or sell them through a third-party agent such as an auction company.

3. In its normal course of dealings with Debtor, Internet Automotive would send Debtor purchase orders that identified pre-owned automobiles that Debtor would resell. The purchase orders would identify specific vehicles by vehicle identification number. The purchase orders also included a sales price that was subject to change through informal negotiations or discussions between Internet Automotive and Debtor. Internet Automotive would then deliver the automobiles identified in the purchase orders to Debtor or to third-parties on behalf of Debtor.

4. Generally, Internet Automotive would retain title to the automobiles delivered to Debtor; and as a result, Internet Automotive remained the owner of the automobiles until they were sold. Once Debtor sold an Internet Automotive vehicle, Internet Automotive, as owner of the

---

1. Further references to the Bankruptcy Code shall be by section number only.

2. The Court notes that to the extent any of the following Findings of Fact constitute Conclu-sions of Law, they are adopted as such, and to the extent any of the following Conclusions of Law constitute Findings of Fact, they are also so adopted.

vehicle sold, was entitled to the sale proceeds produced. Normally, Debtor sold the pre-owned automobiles for the best price he could obtain; and following the sale, Debtor would remit the sale proceeds to Internet Automotive less a $200.00 commission. In turn, Internet Automotive would release the titles to Debtor or the purchasers.

5. On occasion, Internet Automotive would deliver vehicles directly to Statesville Auto Auction ("Statesville") on Debtor's behalf. In turn, Statesville would then directly sell the vehicles by auction.

6. The proceeds produced by the sale would be sent to Debtor who would then remit the proceeds to Internet Automotive. On occasion, Statesville would directly remit proceeds to Internet Automotive.

7. Debtor asserted that Internet Automotive was required to deliver pre-owned vehicles that were "within $150.00 of frontline ready." Delivery of a pre-owned vehicle "within $150.00 of front-line ready" meant that the total cost of preparing a pre-owned vehicle for resale would be no more than $150.00.

8. Internet Automotive delivered the following nine automobiles which are identified by vehicle identification numbers: [3] KLATA5262YB479988, KLATA5263YB479336, KLATA5268YB479381, KLAVA6926YB222219, KLAVA6926YB221457, KLAVA6929YB221551, KLAVA6920YB227934, KLAVA6924YB273377, and KLATA5261YB473485 (collectively, the "Group One Vehicles").

9. Debtor sold the Group One Vehicles and then remitted a check numbered 6342 in the amount of $97,800.00 to Internet Automotive. Debtor also noted that the $97,800.00 did not represent the full price of the vehicles that Internet Automotive delivered because Internet Automotive had agreed for Debtor to deduct some amount of the proceeds as reimbursement for the costs associated with preparing the Group One Vehicles for resale.

10. Internet Automotive also delivered three vehicles numbered KLATA5262YB479337, KLATA5262YB479943, and KLATA5269YB477798. After Debtor eventually failed to pay for these vehicles, Internet Automotive repossessed the three vehicles and then sold them itself through Statesville.

11. In addition to the Group One Vehicles, Debtor testified that he sold the following seven automobiles that were delivered to him by Internet Automotive: KLATA526XYB479690, KLATA5267YB480828, KLAVA6928YB244285, KLAVA692XYB227570, KLAVA6920YB228193, KLAVA6922YB229796, and KLAVA6925YB230361 (collectively, the "Group Two Vehicles"). As a result of the sales, Debtor received $69,700.00 in proceeds.

12. Debtor explained that he remitted a check numbered 6343 in the amount of $69,700.00 to Internet Automotive as payment for the Group Two Vehicles, but later stopped payment of that check because Debtor believed that Internet Automotive owed him as much as $23,000.00 over their entire course of their dealings as reimbursement for escalating delivery and repair costs caused by Internet Automotive's failure to deliver vehicles that were "within $150.00 of front-line ready."

13. During Debtor's course of business with Internet Automotive, he would, at times, send invoices to Internet Automo-

---

**3.** All references to Internet Automotive vehicles will be done by vehicle identification number.

tive for reimbursement of repair costs beyond the "$150.00 front-line ready amount." In some instances, Internet Automotive would remit a reimbursement payment to Debtor. There is no record of this type of exchange concerning the Group Two Vehicles.

14. During its course of business with Debtor, Internet Automotive additionally delivered the following eight vehicles to Debtor or to a third party on behalf of Debtor:

KLAVA6922YB235288, KLAVA6927YB236999, KLAVA6920YB244331, KLAVA6923YB243464, KLAVA6922YB227661, KLAVA6925YB216492, KLAVA6927YB220205, and KLAVA6924YB222204 (collectively, the "Group Three Vehicles"). The purchase orders for the Group Three Vehicles reflect that their collective value was $80,800.00.

15. Internet Automotive asserts that it received no payment for the Group Three Vehicles nor regained possession of them. Debtor also testified that he has no recollection or knowledge of the disposition or location of these vehicles and no records concerning the status of these vehicles since his business records were destroyed when he failed to make a timely payment to the storage company holding such records.

16. George Lamb ("Lamb"), a general manager for Internet Automotive, testified that he was required to deliver some titles for the Group Three Vehicles to third parties who had apparently purchased the vehicles from Debtor or an agent of Debtor such as Statesville. However, the business records that Internet Automotive pre-sented at trial do not reflect which specific titles were delivered.

17. Internet Automotive alleges that Debtor converted the $69,700.00 in proceeds produced from selling the Group Two Vehicles. Internet Automotive also alleges that Debtor converted the Group Three Vehicles and any resulting proceeds from selling Group Three Vehicles by failing to deliver such items to Internet Automotive.

18. Internet Automotive contends that Debtor's conversion resulted in damages equaling the sum of the $69,700.00 in proceeds received by Debtor from the sale of the Group Two Vehicles and the $80,800.00 value of the Group Three Vehicles.

19. On January 18, 2002, Internet Automotive brought a pre-petition suit against Debtor claiming conversion, breach of contract, and fraud in state court. Debtor was properly served, yet he failed to appear at the scheduled trial. As a result of Debtor's failure to appear, the state court entered a default judgment which included the $61,700.00[4] value of the Group Two Vehicles and the $80,800.00 value of the Group Three Vehicles.

20. More than a year later, Debtor filed for bankruptcy on March 7, 2003.

### CONCLUSIONS OF LAW

Internet Automotive seeks to have an indebtedness owed to it by Debtor declared nondischargeable pursuant the § 523(a)(6). "Section 523(a)(6) states that a discharge under the Bankruptcy Code does not discharge an individual debtor from any debt for 'willful and malicious injury by the debtor to another entity or to

---

4. The Court notes that the state court apparently calculated the $61,700.00 judgment award for conversion of the Group Two Motor Vehicles by tallying the value of those vehicles as established by corresponding pur-chase orders. However, the $69,700.00 discussed in this adversary proceeding represents sales proceeds that Debtor procured from selling the Group Two Vehicles.

the property of another entity.'" 11 U.S.C. § 523(a)(6); *Ruben v. Harper (In re Harper),* 220 B.R. 252, 260 (Bankr. D.S.C.1997). In light of the statutory language expressed in § 523(a)(6), Internet Automotive must demonstrate that the debt it seeks to be declared nondischargeable was brought about by Debtor's "willful" and "malicious" injury to Internet Automotive or its property. Furthermore, in dischargeability proceedings, the creditor bears the burden of proof and must prove his case by the preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)("the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard."); *In re Harper,* 220 B.R. at 262. Therefore, in this case, the Court must determine whether Internet Automotive demonstrated, by a preponderance of the evidence, that the injury it suffered at the hands of Debtor was both "willful" and "malicious."

■ In *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the Supreme Court stated:

The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, *i.e.,* "reckless" or "negligent," to modify "injury."

523 U.S. at 61, 118 S.Ct. 974. Thus, it is clear that "willful," as used in § 523(a)(6), connotes intent to bring about an injury, and not merely intent to commit an act that causes an injury. *Id.; Beckett v. Bundick (In re Bundick),* 303 B.R. 90,

106–07 (Bankr.E.D.Va.2003). "Willful" also requires more than a "reckless disregard." *Kawaauhau v. Geiger,* 523 U.S. at 61, 118 S.Ct. 974. In the Fourth Circuit, malicious injury is brought about when "a debtor's injurious act is done deliberately and intentionally in knowing disregard of the rights of another." *See First Nat'l Bank v. Stanley (In re Stanley),* 66 F.3d 664, 667 (4th Cir.1995). Furthermore, in the Fourth Circuit, "it is the debtor's subjective state of mind that is relevant" and malice can be found implicitly through the "act and conduct of the debtor in the context of the surrounding circumstances." *Id.* at 668.

*The Group Two Vehicles*

In this case, Internet Automotive asserts that Debtor's failure to deliver the $69,700.00 in proceeds from the sale of the Group Two Vehicles constitutes conversion and therefore meets the requirements of § 523(a)(6).

■■ In South Carolina, conversion is defined as "the unauthorized assumption and exercise of the rights of ownership over goods or personal chattels belonging to another, to the alteration of their condition or to the exclusion of the owner's rights." *SSI Medical Services, Inc. v. Cox,* 301 S.C. 493, 498, 392 S.E.2d 789, 792 (1990)(citing *Owens v. Andrews Bank & Trust Co.,* 265 S.C. 490, 220 S.E.2d 116 (1975)). Furthermore, in South Carolina, money may be converted when it is capable of being identified and there may be a conversion of determinate sums of money even though the specific coins and bills are not identified. *Id.*

■ When determining whether an injury resulting from an act of conversion is willful, relevant inquiry requires defining the "true injury" suffered by a creditor. *In re Rountree,* Nos. 00–12684C–7G, 01–2003, 2002 WL 832669 at *6–7 (Bankr.

M.D.N.C. May 1, 2002) (citing with approval and quoting *In re Russell*, 262 B.R. 449, 454–55 (Bankr.N.D.Ind.2001)). Once the injury is identified, the Court must look to the Debtor's subjective state of mind to determine whether Debtor intended to bring about such an injury. *Ferraro v. Ballard (In re Ballard)*, Nos. 00–71225–S, 00–07041–S, 2001 WL 1946239 at *14 (Bankr.E.D.Va.2001)(citing *Branch Banking & Trust Co. v. Powers (In re Powers)*, 227 B.R. 73 (Bankr.E.D.Va.1998)).

 In light of the facts of this case and state law with respect to conversion, the Court concludes that the true injury suffered by Internet Automotive is the loss of ownership and possession of the $69,700.00 in proceeds that Debtor admitted he had a duty to remit to Internet Automotive.

The facts indicate that Debtor understood that Internet Automotive vehicles delivered to Debtor and any proceeds produced from their sale belonged to Internet Automotive. Debtor admitted as much by acknowledging that he did not take title to Internet Automotive vehicles and that he had a duty to remit, to Internet Automotive, any proceeds produced from the sale of such vehicles. Debtor understood that withholding the $69,700.00 in proceeds from the sale of the Group Two Vehicles would prejudice Internet Automotive's ownership interests. Under South Carolina conversion law, the true injury Internet Automotive suffered by Debtor's act of conversion is the deprivation of ownership rights to the proceeds that Debtor had a duty to remit. *SSI Medical*, 301 S.C. at 498, 392 S.E.2d at 792. Debtor intentionally deprived Internet Automotive of its ownership rights to the proceeds; thus, Debtor caused a willful injury by his act of conversion. *See In re Stanley*, 66 F.3d at 668 (recognizing that in the context of a conversion "that [debtor] did not intend for [creditor] to ultimately suffer a loss is legally irrelevant" and that "proper focus" is on debtor's "exercise of dominion and control over funds that he knew belonged to another"); *In re Rountree*, Nos. 00–12684C–7G, 01–2003, 2002 WL 832669 at *6–7.

Determining whether Internet Automotive suffered a malicious injury is the next inquiry to be made by the Court. Malicious injury is brought about when "a debtor's injurious act is done deliberately and intentionally in knowing disregard of the rights of another" and can be implied through a debtor's acts and conduct in the context of surrounding circumstances. *See In re Stanley*, 66 F.3d at 667–68.

Debtor contends that he did not commit a willful and malicious conversion because he withheld the proceeds under a claim that he was entitled to reimbursement of shipping and repair costs incurred for the sale of other Internet Automotive vehicles. However, such an argument is unavailing because Debtor's admission and surrounding circumstances indicate otherwise. Debtor admitted that the proceeds produced from the sale of an Internet Automotive vehicle belonged to Internet Automotive. Debtor,with respect to reimbursement of costs, would normally be reimbursed in small amounts by submitting an invoice to Internet Automotive that would be paid in Internet Automotive's discretion. Debtor's issuance and subsequent order to stop-payment of the $69,700.00 check represented a significant deviation from the normal course of business between the parties. These facts indicate that Debtor understood that he was not entitled to the proceeds produced from his sale of the Group Two Vehicles, but he abruptly deviated from the manner established by his ongoing dealings with Internet Automotive to gain leverage

over the business relationship. In this case, it is clear that Debtor converted Internet Automotive's proceeds intentionally and in "knowing disregard" of the Internet Automotive's rights without just cause or excuse. Thus, the Court finds that Debtor caused Internet Automotive a malicious injury by withholding and thereby converting the proceeds produced from his sale of the Group Two Vehicles. *See In re Stanley,* 66 F.3d at 667–68.

The Supreme Court has warned "There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice." *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 79 L.Ed. 393 (1934). The circumstances in this case hardly indicate an innocent or technical conversion. Since Debtor understood that Internet Automotive had superior ownership rights to the proceeds produced from the sale of the Group Two Vehicles, Debtor's act of conversion is more accurately characterized as a wrongful conversion rather than an innocent or technical one. *In re Stanley,* 66 F.3d at 668.

Therefore, in light of the foregoing analysis, Debtor's intentional deprivation of Internet Automotive's $69,700.00 in proceeds by an act of wrongful conversion is a willful and malicious injury; and pursuant to § 523(a)(6), Debtor's indebtedness to Internet Automotive for $69,700.00 is nondischargeable. *See McIntyre v. Kavanaugh,* 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916)(holding that brokers unauthorized sale of stocks held by them as collateral and appropriation of the proceeds is a willful and malicious injury); *In re Stanley,* 66 F.3d at 667–68 (finding that debtor's deliberate conversion of funds inflicted a willful and malicious injury that exempted debt from discharge); *Robbins v. Chase Manhattan Bank,* Civ. A. No. 93–0001–H, 1993 WL 310632, at *5 (W.D.Va.1993)(holding a debt nondischargeable as a willful and malicious injury to creditor because debtor knowingly took money without concern for creditor's rights); *In re Rountree,* Nos. 00–12684C–7G, 01–2003, 2002 WL 832669 (holding that debtor conversion of proceeds that were to be used as collateral once creditor's motor vehicle is sold by debtor resulted in a willful and malicious injury); *KMK Factoring, L.L.C. v. McKnew (In re McKnew),* 270 B.R. 593, 641 (Bankr.E.D.Va.2001)(finding that debtor's withdrawal of additional funds which exceeded an agreed amount of compensation constituted a "willful and malicious" conversion of creditor's monies for which the court must deny discharge); *CBR, Inc. v. Naff (In re Naff),* Nos. 96–21436–SCS, 96–2112–S, 1997 WL 1088126 at *14–15 (Bankr.E.D.Va.1997)(holding that a debt arising from debtor's sale of automobiles "out of trust" was nondischargeable because debtor's sale of automobiles without paying off the debt related to that inventory was a conversion that resulted in a willful and malicious injury); *Central Fidelity Bank v. Higginbotham (In re Higginbotham),* 117 B.R. 211, 214–16 (Bankr.E.D.Va.1990)(holding that debtor's conversion of proceeds from the sale of automobiles "out of trust" gave rise to a willful and malicious injury and resulted in a nondischargeable debt under § 523(a)(6)).

*The Group Three Vehicles*

Based on the analysis set forth above, Internet Automotive has also presented sufficient evidence to make a *prima facie* showing that Debtor willfully and maliciously injured it by intentionally converting the Group Three Vehicles and any proceeds generated from selling such vehicles. First, there is no dispute that the vehicles were delivered to Debtor or his

agent. Lamb, a manager for Internet Automotive, indicated that some of the vehicles were sold to innocent third party purchasers who subsequently demanded and received a release of titles to those vehicles from Internet Automotive. Once again, Debtor does not dispute that he was aware of his duty to remit, to Internet Automotive, any proceeds produced from selling the Group Three Vehicles.

Although Debtor testified that he has no knowledge or recollection of the whereabouts or status of the Group Three Vehicles because he lost his business records, when the Court provided Debtor and Internet Automotive an opportunity to supplement the record in order to jointly determine the precise whereabouts of the Group Three Vehicles or their proceeds, Debtor declined. Despite the hardships suffered by Debtor, the Court notes that his memory was precise on a number of matters but unclear on unfavorable issues. The Court finds it implausible that Debtor merely lost track of the Group Three Vehicles which he was responsible for selling. Weighing the evidence, it appears that Debtor either wrongfully converted the unsold Group Three Vehicles or wrongfully converted the proceeds from their sale.

In light of Debtor's assertion and all other circumstances present in this case, the Court is simply not convinced by Debtor or any evidence to rebut Internet Automotive's *prima facie* case that Debtor, through a wrongful conversion, intentionally deprived Internet Automotive of ownership to the Group Three Vehicles and any proceeds produced from their sale. Therefore, the Court finds that Debtor has willfully and maliciously injured Internet Automotive by failing to rebut Internet Automotive's evidence which indicates that Debtor was the last custodian of the Group Three Vehicles, that certain vehicles have been sold to consumers, and that Debtor, through a wrongful act of conversion committed with disregard of his duties to Internet Automotive, intentionally deprived Internet Automotive of ownership to the Group Three Automobiles or any associated sale proceeds. *Cf. Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 250 n. 16 (4th Cir.1994) (quoting *In re Reed,* 700 F.2d 986, 992–93 (5th Cir.1983) by noting that with regards to discharge under 11 U.S.C. § 727 "While the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a *prima facie* case. The creditor's burden of persuasion does not obviate the necessity that the debtor provide a satisfactory explanation of the loss of his assets.").

The resulting injuries for Debtor's conversion of the Group Three Vehicles and proceeds produced from their sale must be measured by the evidence submitted and therefore appears equivalent to the $80,800.00 value of the Group Three Vehicles established by the purchase orders submitted by Internet Automotive. Therefore pursuant to § 523(a)(6), Debtor's wrongful act of conversion of the Group Three Vehicles and their corresponding proceeds gives rise to a willful and malicious injury that results in a nondischargeable debt for $80,800.00.

*Conclusion*

Therefore, for the above stated reasons, it is

**ORDERED** that pursuant to § 523(a)(6), Debtor's $69,700.00 indebtedness arising from the willful and malicious injury caused by Debtor's wrongful conversion of proceeds produced from selling the Group Two Vehicles is hereby declared nondischargeable; and it is further

**ORDERED** that pursuant to § 523(a)(6), Debtor's $80,800.00 indebtedness arising from the willful and malicious

injury caused by Debtor's wrongful conversion of the Group Three Vehicles and any proceeds produced from selling such vehicles is also declared nondischargeable.